**SO ORDERED: March 2, 2015.**



**James M. Carr**
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BRADLEY K. BUCHANAN, | ) | Case No. 13-80378-JMC-7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| CONSOLIDATED BROKERS | ) | |
| CORPORATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 13-58016 |
| | ) | |
| BRADLEY K. BUCHANAN, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a bench trial on July 16-18, 2014.  Plaintiff

Consolidated Brokers Corporation, LLC ("CBC") appeared by counsel Jeremy L. Fetty and

Angela L. Gidley.  Defendant Bradley K. Buchanan ("Debtor") appeared by counsel Kelvin L.

1

Roots.  At the conclusion of the trial, the Court took the matter under advisement with the parties invited to submit proposed findings of fact and conclusions of law.

The Court, having reviewed the evidence presented at the trial, Defendants' [sic] Trial Brief filed by Debtor on July 11, 2014 (Docket No. 28) ("Debtor's Trial Brief"), Plaintiff's Trial Brief filed by CBC on July 11, 2014 (Docket No. 29) ("CBC's Trial Brief"), the proposed findings of fact and conclusions of law submitted by each of CBC and Debtor on August 18, 2014 (each, "Proposed Findings/Conclusions"), and the other matters of record in this adversary proceeding; having heard the presentations of counsel at the trial; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052, and memorializes its ruling from the bench on Plaintiff's Motion For Judicial Notice Of Findings Of Fact And Conclusions Of Law And For Exclusion Of Evidence Contradictory Thereto filed by CBC on July 15, 2014 (Docket No. 30) (the "Judicial Notice Motion").

<u>**Collateral Estoppel/Judicial Notice Motion**</u>

On July 21, 2006, CBC filed a complaint against Debtor and others in the Hendricks Superior Court (the "State Court"), Cause No. 32D02-0607-CT-21 (the "State Court Case").  A default was entered against Debtor as a discovery sanction, and a damages hearing (at which Debtor appeared in person and by counsel) was held with respect to damages not specifically set forth in the complaint.  The State Court subsequently entered a money judgment in the amount of $509,229.18 (the "Judgment Debt"), consisting of (1) $45,893.22 on CBC's claim under the Crime Victims Relief Act; (2) $365,432.60 on CBC's claim for breach of fiduciary duty; (3) $0 on CBC's claims for tortious interference with CBC's contract with Bright & Williamson Insurance Agencies, Inc. and CBC's contract with its insureds and insurers, and for bad faith, as

2

the damages are the same; and (4) $97,903.36, joint and severally with Bright & Williamson Insurance Services II, Inc. d/b/a Buck Insurance Services, for attorney fees and costs.

At the beginning of the trial, the Court addressed the arguments raised in the Judicial Notice Motion, CBC's Trial Brief and Debtor's Trial Brief regarding the asserted preclusive effect of the State Court Case and the judgment entered therein.

"The preclusive effect of a state court judgment in a subsequent federal lawsuit is determined by the full faith and credit statute, which requires federal courts to refer to the preclusion law of the State in which judgment was rendered." *Communitywide Fed. Credit Union v. Laughlin (In re Laughlin)*, 2014 WL 789127, at *5 (N.D. Ind. 2014) (citations omitted). Indiana uses a two-prong test[1] for the offensive use of collateral estoppel[2] adopted by the Indiana Supreme Court in *Tofany v. NBS Imaging Sys., Inc.*, 616 N.E.2d 1034, 1038 (Ind. 1993), which is:  (1) "whether the party in the prior action had a full and fair opportunity to litigate the issue"; and (2) "whether it is otherwise unfair to apply collateral estoppel given the facts of the particular case." *Id.*

The Court concluded and announced at the beginning of the trial that the *Tofany* test has not been met, particularly with respect to whether Debtor had a full and fair opportunity to litigate in the State Court Case, because:  (a) Debtor's liability was established in the State Court Case by default entered as a discovery sanction;[3] and (b) the State Court affirmatively disallowed

---

[1]    These factors are non-exhaustive.  Other considerations are discussed in *Tofany v. NBS Imaging Sys., Inc.*, 616 N.E.2d 1034, 1038-39 (Ind. 1993).

[2]    "The term 'offensive' collateral estoppel has been used to describe the situation where the 'plaintiff seeks to foreclose the defendant from litigating an issue the defendant had previously litigated unsuccessfully in an action with another party.' "  *Tofany*, 616 N.E.2d at 1037 (quoting *Parklane Hosiery v. Shore*, 439 U.S. 322, 326 n.4, 99 S.Ct. 645, 649 n.4, 58 L.Ed.2d 552 (1979)).

[3]    Debtor later recovered on a malpractice claim against his then-attorney, some proceeds of which were turned over to CBC.

3

as improper Debtor's attempts to interject any substantive issue during a damages hearing because of the prior entry of default. In addition, all factors required to be proven for a determination of nondischargeability under 11 U.S.C. §§ 523(a)(4) and/or (a)(6) were not litigated or established by default in the State Court Case. For example, a "breach of fiduciary duty" is not necessarily the same thing as "fraud or defalcation while acting in a fiduciary capacity," and the "knowing or intentional" component of conversion under Indiana law is not necessarily the same thing as "willful and malicious" injury.[4] Thus, the Court will not give preclusive effect to the judgment entered in the State Court Case as to the issue of liability (or the nondischargeability of various claims) but will instead analyze whether the facts proven at trial, particularly with respect to scienter, support a conclusion of nondischargeability.

The Court further concluded and announced at the trial that CBC's claims against Debtor had been liquidated in the State Court Case (with Debtor's and his counsel's participation in a damages hearing) and that the Court will give preclusive effect to the amount of the Judgment Debt. However, the Court also noted that CBC would have to prove what parts of the Judgment Debt fall under 11 U.S.C. §§ 523(a)(4) and/or (a)(6).

For these reasons, the Judicial Notice Motion is **GRANTED** as to the amount of the Judgment Debt and **DENIED** as to the issue of liability (or the nondischargeability of various claims).

---

[4]     *See Kriescher v. Gibson (In re Gibson)*, 521 B.R. 645, 653 (Bankr. W.D. Wisc. 2014) ("facts essential to each component of the Judgment must satisfy the elements of a discharge exception. One illustrative reason for this is that the discharge exceptions the Plaintiffs rely on require an inquiry into the Defendant's state of mind. *See McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000) …; *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (embezzlement pursuant to section 523(a)(4) requires 'fraudulent intent or deceit'); *Bullock v. BankChampaign, N.A.*, ––– U.S. –––, 133 S.Ct. 1754, 1757, 185 L.Ed.2d 922 (2013) (defalcation under section 523(a)(4) requires 'a culpable state of mind'); *Jendusa–Nicolai v. Larsen*, 677 F.3d 320, 322–23 (7th Cir. 2012) (section 523(a)(6) requires injurer *desire* to inflict injury or *know* it was highly likely to result).")

**Findings of Fact**

At the conclusion of the trial, the Court announced from the bench that it had serious questions with regard to the credibility of many of the witnesses because the inconsistencies in their descriptions of relevant events were such that all of the testimony could not be truthful. The Court found that portions of the testimony of all of the principal witnesses lacked credibility. The Court invited counsel for each party to submit proposed findings of fact and conclusions of law that focused on corroboration of those parts of the inconsistent testimony that they believe support their client's position.

The Court has taken a great deal of time to independently and closely review the witness testimony in other parts of the record and look for indicia of credibility in his/her prior testimony, documents admitted into evidence at the trial, and/or the testimony of other witnesses. The Court has attempted to reconcile the contradictory evidence admitted at the trial, but that was not possible for a number of material facts because the Court found no witness credible on certain material points and there was either no supporting evidence or incomplete supporting evidence to make one version more credible than another. The Court will note some of such cases in the following findings of fact.

1.      On April 3, 2013, Debtor filed a voluntary petition under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),[5] in the United States Bankruptcy Court for the Southern District of Indiana, Terre Haute Division.

2.      On December 19, 2013, Debtor received his general discharge.

3.      On June 10, 2013, CBC timely filed a Complaint To Determine Nondischargeability Of Debt (Docket No. 1) to initiate this adversary proceeding, wherein CBC

---

[5]      All statutory references hereinafter are to the Bankruptcy Code unless otherwise noted.

alleges that the Judgment Debt owed to CBC is nondischargeable under §§ 523(a)(4) and/or (a)(6).[6]

4.      On August 21, 2013, Debtor filed his Answer To Plaintiff's Complaint To Determine Dischargeability (Docket No. 13), in which he denied all material allegations.

5.      CBC is an Indiana limited liability company formed in 1999, and its sole member is John Scott ("Scott").

6.      Debtor met Scott in 2000 while both worked for Consolidated Insurance in Indianapolis, Indiana.  Debtor left Consolidated Insurance in early 2004, and Scott left in late 2004.

7.      After leaving Consolidated Insurance, Debtor began "writing" or issuing policies for his cousin, Robert A. Gredy ("Gredy"), who had an insurance agency in Nashville, Indiana with a corporate name of Bright & Williamson Insurance Agencies, Inc. ("Nashville").

8.      At some point during 2004, Debtor and Scott began taking steps to work together in the insurance business.  On or about April 7, 2004, pursuant to a Toler-Keller Partnership Lease, CBC leased office space at 7121 East US Highway 36, Avon, Indiana (the "CBC Office").  Scott and Debtor both signed the lease as "lessee."

9.      Debtor introduced Scott to Gredy.  On or about May 19, 2004, Nashville and CBC entered into a Bright & Williamson, LLP Limited Liability Partnership Agreement (the "Partnership Agreement").  Scott signed the Partnership Agreement on behalf of CBC, and Debtor signed underneath Scott.  CBC entered into the Partnership Agreement because Scott was looking to expand into more markets.

---

[6]      In CBC's Proposed Findings/Conclusions, CBC mentions for the first time, as far as the Court can tell, nondischargeability pursuant to § 523(a)(2)(A).  Having failed to plead a cause of action pursuant to that subsection or to move to amend the pleadings at trial, nondischargeability will only be decided pursuant to §§ 523(a)(4) and (a)(6).

10.     Pursuant to § 6 of the Partnership Agreement, members of CBC were allowed "to qualify and serve as agents representing each insurance provider" with which Nashville had a brokerage contract, including Grange, Pekin, Acuity, Safeco, General Casualty, Progressive, Allstate and Standard Mutual (collectively, "Nashville's Companies"), "subject to the term, conditions and restrictions of [Nashville's Companies]."  Similarly, shareholders and officers of Nashville were allowed "to qualify and serve as agents representing each insurance provider" with which CBC had a brokerage contract, including Philadelphia, Bituminous, and Pennsylvania Lumbermen (collectively, "CBC's Companies"), "subject to the term, conditions and restrictions of [CBC's Companies]."  Pursuant to § 12 of the Partnership Agreement, CBC and Nashville were each to be paid "the commission generated by premiums for insurance products paid by its clients."  In addition, Nashville was to be paid a fee equal to 5% of any premium commissions paid to CBC on CBC's client accounts when insurance coverage was procured from Nashville's Companies.  There was not a reciprocal provision whereby Nashville would pay a percentage of its commissions when it procured coverage through CBC's Companies.

11.     Pursuant to § 3 of the Partnership Agreement, CBC was authorized to use a derivation of the "Bright & Williamson, LLP" name as a "doing business as" designation in connection with its own insurance business.  CBC sometimes operated using the d/b/a designations "Bright & Williamson Insurance" and "Bright & Williamson Insurance and Financial Services."

12.     Scott and Debtor both worked as licensed insurance agents at the CBC Office under the aforementioned Bright & Williamson d/b/as providing certain insurance products[7] to clients (the "Business").

13.     There are no documents that exist between or among Debtor, Scott and/or CBC documenting the nature of this Business relationship between Scott and Debtor, such as an employment agreement, an independent contractor agreement, a partnership agreement,[8] the CBC operating agreement, or a non-compete agreement.

a.     Scott was adamant that CBC was his business, and that Debtor was not his business partner.  In a November 20, 2007 deposition (the "Deposition") given in connection with the State Court Case, Scott testified that Debtor was an independent contractor of CBC.

b.     Debtor represented his relationship with Scott and/or CBC to other parties in a number of different ways in various documents admitted into evidence at the trial.  For example:

> Independent Contractor with CBC – Affidavit of Brad Buchanan executed on January 31, 2005 in connection with a lawsuit brought by Scott and CBC against Consolidated Insurance and others in the Marion Superior Court.
>
> Partner – Non-Exclusive Brokerage Agreement between Gresham and Associates, Inc. and Bright & Williamson Insurance dated July 13, 2004.
>
> Company Representative of Bright & Williamson Insurance – Dunhill Staffing Systems, Inc. Conversion Agreement dated August 6, 2004.

---

[7]     Debtor testified that both Scott and Debtor wrote life and health insurance policies separate from the Business.  This testimony is contradicted by Defendant's Exhibit J, a letter from Scott to Ken Sarbuagh dated December 30, 2004, claiming that "Bright & Williamson is truly a one stop shop" that provides health and life products.  It is further contradicted by the damages awarded to CBC in the State Court Case for the loss of the Pools of Fun account, including its dental and health policies.  There was no evidence of a written or oral agreement among CBC, Scott and/or Debtor as to what coverages would be written through the Business and what coverages could be written "on the side."

[8]     Debtor testified that although he was not an owner of CBC, the Partnership Agreement was "our partnership."  By its terms, the only two parties to the Partnership Agreement are Nashville and CBC.

Principal – Hasler Meter Agreement with Bright & Williamson Insurance Financial Services dated August 11, 2004; American Interstate Insurance Company Producer Agreement dated April 29, 2005.

Agency Owner – Agency Agreement between Deerbrook Insurance Company and Bright & Williamson Insurance.

Debtor considered himself an owner of, and/or a partner of Scott's in, the Business operating at the CBC Office. Debtor invested $5,000 in the Business by directing that a portion of a commission he was due from selling an annuity (separate from the Business) be payable by check written to Bright & Williamson.

       c.      The testimony and documentary evidence do not conclusively establish the nature of the relationship among CBC, Scott and Debtor in or with respect to the Business.

       d.      Regardless of the form or nature of their relationship, both Debtor and Scott testified that Debtor owed CBC a fiduciary duty, which the Court will treat as an uncontested fact with respect to Debtor's acting in a "fiduciary capacity."

      14.     During the time the Business operated at the CBC Office:

       a.      Scott authorized Debtor to develop agency relationships with carriers for whom CBC could write policies. Debtor completed paperwork to establish such relationships on CBC's behalf.

       b.      Scott and Debtor were authorized to sign CBC checks written on CBC's Lincoln Bank account (the "Account"). CBC had poor controls at best, no controls at worst, over the Account.

       c.      Debtor had a separate account at First National Bank (the "FNB Account") for which he was the only authorized signatory. CBC had a separate account at Regions Bank for which Scott was the only authorized signatory.

d.      There was no written agreement as to the "ownership" of client accounts as between CBC and Debtor.

i.      With the exception of (a) limited testimony regarding particular clients, (b) a list of CBC's clients as of February 28, 2004 provided through discovery in the State Court Case, and (c) Defendant's Exhibits NN and OO that were admitted into evidence at the trial without explanation or context, there was little evidence regarding who (Scott, Debtor or another agent) brought which client into the Business.

ii.      Scott's testimony as a whole seems to indicate that he thinks every client to whom a policy was sold and/or serviced through the Business at the CBC Office is CBC's client.  However, he also testified about some of the efforts he undertook to secure "his" book of business from Consolidated Insurance when he left.

iii.      Based on the evidence, the Court cannot find that CBC was the owner of all accounts sold or serviced through the CBC Office, nor can it allocate (with a few specific exceptions) clients between Debtor and CBC/Scott.

e.      There was no written agreement as to Debtor's compensation for his work in the Business.

i.      Scott testified that Debtor's only compensation was commissions Debtor earned on policies he sold, and that there was no split between CBC and Debtor (that is, Debtor was to receive 100% of the commission).  Scott testified that Debtor wrote himself commission checks.

ii.      Debtor testified that he received no commission checks while working at the CBC Office.  He claims to have taken approximately $3,600 out of the Business as draws.

10

iii.    There is no documentary evidence or incomplete documentary evidence supporting either version of the compensation arrangement.

iv.    The Court finds that neither Scott nor Debtor is more credible with respect to what compensation Debtor was to or did receive, whether through commissions or draws, for his work in the Business.

f.    There was no written policy with regard to payment of agents' professional licensing fees. CBC had poor controls at best, no controls at worst, over whether persons writing insurance on its behalf at/from the CBC Office had insurance licenses in effect during the times they worked for or with CBC. At some point while working at the CBC Office, Debtor's insurance license expired. His license was reinstated after payment of the renewal fee and the penalty associated therewith.

g.    There was no written policy with regard to the binding of insurance coverage.

i.    Scott testified that the person who deposited a client's check was responsible for binding coverage or otherwise ensuring that coverage was bound.[9]

ii.    Debtor testified that the writing agent had the ultimate responsibility for binding coverage, but sometimes the writing agent delegated that authority to a customer service representative.

iii.    Maggie Hayes ("Hayes"), who worked for some period as a customer service assistant or customer service representative at the CBC Office, testified that she would give a client's check to whatever producer (which the Court understands to mean the same thing as the "writing agent") was in the CBC Office at the time the check was received, regardless of whose file it was. If a producer gave a file to her with binding instructions, she

---

[9]    Copies of various deposit slips that were admitted into evidence at the trial were prepared by Debtor.

11

would send those instructions to the insurance company over the producer's signature and ask that coverage be bound.  Producers also bound their own coverage if Hayes was not in the CBC Office or if a producer wanted to handle a particular account him/herself.

        iv.      There is no documentary evidence or incomplete documentary evidence supporting either version.

        v.      The Court finds that neither Scott nor Debtor is more credible with respect to who, working for or with the Business, was responsible for binding coverage for clients.

        h.      There was no written policy making agents or employees personally liable if they made mistakes binding coverage.  CBC carried errors and omissions coverage for such situations.

        i.      There was no agreement between the parties as to the financial status of the Business.

        i.      Scott testified that the Business was "doing all right" in 2004-06, though it was probably not making a profit.

        ii.      Debtor testified that the Business did not always have enough money to pay its bills, and that when Scott would withdraw large sums of money for himself from the Business, it put the Business in a bind.

        iii.      Gredy testified that CBC did not pay its share of the monthly payments due for the AMS (as defined below).

        iv.      There is no documentary evidence or incomplete documentary evidence supporting either version.

v.    The Court finds that neither Scott nor Debtor is more credible with respect to the financial status of the Business.

15.    The business relationship between CBC and Debtor ended on April 28, 2006. Scott and Debtor agree on the date, but do not agree on the circumstances under which they parted ways.

a.    Scott testified that he was in the CBC Office working on a renewal for his largest account, Horning Roofing. When he searched for a file, he noticed that all his client files, some administration files and filing cabinets were gone. He had a very short conversation with Debtor when Debtor came into the CBC Office with his friend, Doug Lairmore, toward the end of the day. Debtor told Scott that Debtor was leaving the Business. Scott asked where his files were, and Debtor replied, "I'm out of here." Scott believes Debtor took the files between April 27, 2006 and April 28, 2006 without Scott's authorization.

b.    Debtor testified that he had many discussions with Scott prior to April 28, 2006 regarding the status of the Business and the need for change, including that Scott needed to stop taking so much money out of the Business, that the Business needed to pay its bills, and that Debtor needed to start getting paid. If these changes were not made, Debtor told Scott that Debtor would start writing business on his own. Debtor did not think things had changed, so he called Scott from a Pacers game that he was attending with a client on the evening of April 27, 2006 and told Scott that Debtor would be leaving the Business and that Debtor would come into the CBC Office on April 28, 2006 to separate the files. Debtor arrived at the CBC Office on April 28, 2006 with a truck and trailer. Debtor and Scott went through each file and agreed on whether Debtor would take the file or whether it would stay with Scott at the CBC Office. Debtor described this as a pretty cordial process that probably took about two hours. Debtor also

removed filing cabinets with Scott's consent, as well as his personal rolodex, personal computer and personal belongings. Debtor left copies of the company contacts from his rolodex with Scott, as well as the Panasonic phone system Debtor had purchased which was too much of a hassle to take.[10] There were two police officers present to ward off any potential problems. Initially, they entered the CBC Office, and then stayed in the parking lot.[11]

      c.     Hayes testified that after a discussion between Scott and Debtor during which they decided to part ways, she observed Scott and Debtor going through each file and dividing them between themselves. Two Avon police officers were present at the CBC Office while this was happening.[12]

      d.     The Court finds that neither Scott nor Debtor is more credible with regard to the events of April 28, 2006. Under either scenario, Debtor had files at the Buck Office (as defined below) for some clients to whom policies were sold and/or serviced through the Business, but the Court cannot with specificity say which files those were (with a few exceptions). Based on the evidence, the Court cannot find whether Debtor came into the possession of those files/documents during the division of files (per Debtor's account) or by unauthorized removal (per Scott's account).

      16.     On May 23, 2006, Nashville gave notice to CBC and Debtor of its termination of its partnership with CBC pursuant to § 26 of the Partnership Agreement. The notice stated that

---

[10]     Debtor's testimony on this point is contradicted by Defendant's Exhibit H, which includes a copy of a check written on the Account and signed by Debtor to pay for the phone system.

[11]     An Avon Police Department Voluntary Statement/Witness Form completed by Debtor dated May 8, 2006 both supports and contradicts Debtor's testimony at trial (Plaintiff's Exhibit JJJJJ). An Avon Police Department Voluntary Statement/Witness Form completed by Douglas B. Lairmore dated May 6, 2006 describes a civil division of files (Plaintiff's Exhibit HHHHH).

[12]     An Avon Police Department Voluntary Statement/Witness Form completed by Hayes dated May 6, 2006 does not describe a division of the files about which Hayes testified at the trial (Plaintiff's Exhibit IIIII).

the "decision was predicated upon limited partnership sales and the cancellation of brokerage

contracts with [CBC] by various underwriters and insurance companies."

        a.     There is no evidence, and it cannot be inferred from the totality of the

circumstances, that Debtor caused or induced Gredy to terminate the Partnership Agreement.

Gredy appears to have made decisions and acted on behalf of Nashville after learning that Debtor

ended his Business relationship with CBC/Scott, but there was no assertion or evidence that

Nashville violated the Partnership Agreement by the manner in which it terminated the

Partnership Agreement.  Nor was there evidence that Debtor violated any agreement or contract

by leaving the Business, whether through the phone call from the Pacers game as Debtor

contends or by saying "I'm out of here" as Scott contends, and so there was no "wrongdoing"

with respect to ending the Business relationship.  (That is not to say that there was no

wrongdoing in Debtor's actions before or after Debtor and CBC/Scott parted ways; rather, this is

limited to Debtor's decision to leave the Business and his communication thereof to CBC/Scott.)

From the evidence, it appears that Gredy was distancing himself and Nashville from both

CBC/Scott and Debtor, as opposed to preferring, favoring or working with Debtor.[13]

        17.     Gredy notified two of Nashville's Companies – Acuity by letter dated May 11,

2006 (the "Acuity Letter") (Plaintiff's Exhibit ZZ) and Standard Mutual by letter of unknown

date – that it would no longer be associated with CBC, Scott and Debtor.[14]  Those two

companies maintained brokerage contracts with Nashville only, so CBC wrote Acuity and

---

[13]     See also ¶¶ 17 and 27 below.

[14]     In the Affidavit Of Robert A. Gredy dated October 9, 2009 (the "Gredy Affidavit"), Gredy stated that, after
being advised of the end of the Business relationship between Debtor and CBC/Scott, he notified Acuity and
Standard Mutual that Nashville would no longer be associated with the CBC Office in order to protect the best
interests of Nashville and not in bad faith or with the intent to deceive CBC, Scott or Debtor (Defendant's Exhibit
RR).

Standard Mutual policies for its clients through Nashville's brokerage contracts pursuant to § 6 of the Partnership Agreement.

a.      After the Business stopped operating, Hayes typed a draft of the Acuity Letter for Gredy.

b.      Scott testified that the Acuity Letter effectively ended CBC's ability to write policies for its clients through Nashville's contract with Acuity, which is supported by the letter dated May 17, 2006 that Acuity sent to Scott (Plaintiff's Exhibit AAA).  Scott further testified that he believes that some of the clients who had Acuity or Standard Mutual policies went to Buck (as defined below) and/or were lost because of his dispute with Debtor.

c.      CBC's ability to write policies through Acuity would have ended on or around May 23, 2006, even without the Acuity Letter, when Gredy terminated the Partnership Agreement.

d.      If CBC were to write for those companies, it would have to establish its own brokerage contracts.

e.      Other than Hayes' typing and transmitting the draft Acuity Letter to Gredy, there is no evidence, and it cannot be inferred from the totality of the circumstances, that Debtor caused or induced Gredy to send the Acuity Letter or the letter to Standard Mutual.

18.      After the Business stopped operating, Scott testified that CBC could no longer write policies for its clients through Pekin (one of Nashville's Companies).  This may also have been the case with Grange (also one of Nashville's Companies), but Scott's testimony was unclear on this point, including (a) whether/when CBC established its own agreement with

Grange; and (b) if so, which clients he wrote Grange policies for through CBC's contract as opposed to Nashville's contract.[15]

        a.      Scott also testified that he believes that some of the clients who had Pekin or Grange policies went to Buck and/or were lost because of his dispute with Debtor.

        b.      CBC's ability to write policies through Pekin and Grange would have ended on or around May 23, 2006 when Gredy terminated the Partnership Agreement (unless CBC had established its own brokerage contracts).

        c.      While the Court does not doubt that CBC lost clients, the Court does not find Scott's testimony credible, including because it is contradicted by the Grange Letter (which appears not to have been sent in response to any communication from Gredy, Debtor, CBC or Scott). With no other supporting evidence and for the reasons described in ¶¶ 16(a) and 17(e) above, the Court cannot find that Debtor is responsible for CBC's losing its ability to write policies through Pekin and Grange via their brokerage contracts with Nashville.

19.      After the Business stopped operating, CBC lost its ability to write policies through Burns & Wilcox (neither one of Nashville's Companies or CBC's Companies). Scott testified that such loss was the result of Burns & Wilcox's dealings with Debtor.

        a.      While the Court does not doubt that CBC lost clients, the Court does not find Scott's testimony credible on this point. With no other testimony or documentary evidence to support Scott's testimony, the Court cannot find that Debtor is responsible for CBC's losing its ability to write policies through Burns & Wilcox.

20.      Scott testified that he lost clients (the "Zurich Clients") for whom he had written policies through Zurich (neither one of Nashville's Companies or CBC's Companies). Scott

---

[15]      Grange sent a letter (the "Grange Letter") dated June 15, 2006 to Nashville terminating its agency contract due to insufficient production (Defendant's Exhibit S). The greeting of the Grange Letter included "Bob [Gredy], Brad [Debtor] and John [Scott]," though it appears to have been sent only to Nashville's office.

testified that Debtor rewrote policies for some Zurich Clients through Buck, but he did not know if the remaining Zurich Clients went to Buck.

      a.    While the Court does not doubt that CBC lost the Zurich Clients, the Court cannot find that Debtor is responsible for CBC's losing the Zurich Clients particularly when there is no agreement as to the ownership of accounts.

      21.    Beyond the Acuity Letter, there is no evidence showing Debtor (or someone working with or for him or Buck) being involved in contacting any insurance company for the purpose or with the intent of preventing CBC/Scott from writing policies for them.  Therefore, the Court cannot find that Debtor is responsible for CBC's losing its ability to write policies through them.  As to the loss of specific clients, such as the Zurich Clients, Full O Pep, Pools of Fun and Horning Roofing, the evidence is likewise insufficient to find that Debtor is responsible for CBC's losing them as clients.

      22.    After parting ways with Debtor, Scott worked to rebuild CBC.  Scott testified that he learned several things after April 28, 2006:

      a.    CBC's voice mail, email and agency management systems were sabotaged.  The parties disagree on this point.

          i.    Scott testified that he believes Debtor engaged in a highly coordinated effort, also described as sabotage, to shut CBC down.  In addition to removing all client files from the CBC Office, Scott believes (a) Debtor changed the passwords for the voice mail system and/or called in and retrieved voice mail messages meant for CBC; (b) Debtor changed or revoked the passwords for the email system so CBC could not access it;[16] and (c) Debtor and/or Gredy revoked or changed the passwords to the agency management system

---

[16]    In the Deposition, Scott testified that CBC no longer had access to the email system as of May 9, 2006 (Defendant's Exhibit CC).

("AMS") so CBC could not access it.[17]  Scott testified that these systems became unavailable contemporaneously with the events he alleges happened on April 28, 2006.

        ii.     Debtor testified that he did not engage in sabotage.  CBC was obligated to make a monthly payment to Nashville for the AMS.  Those payments were not made, and CBC defaulted in early 2006.

        iii.    Gredy testified that he did not engage in sabotage.  Nashville did not have the AMS prior to entering into the Partnership Agreement.  After acquiring the AMS, Nashville, CBC and his son's agency in Bloomington, Indiana were each using it and splitting the $700-$800/month cost evenly.  CBC paid its one-third share for a while, and then stopped.  After his son also stopped paying his one-third share, Gredy determined that it was not worth the full monthly payment and stopped paying.  After a few months of non-payment, access to the AMS was cut off for non-payment and was no longer available to Nashville, CBC or Gredy's son's agency.  Gredy could not recall specifically when this happened.[18]

        iv.    There is no documentary evidence or incomplete documentary evidence supporting either version.

        v.     The Court finds that neither Scott nor Debtor is more credible with respect to sabotage of the voice mail and email systems.  The Court relies on Gredy's testimony to find that neither Debtor nor Gredy sabotaged the AMS.

        b.     A toner cartridge (the "Toner Cartridge") was missing from the CBC Office.  The parties disagree on this point.

---

[17]    In the Deposition, Scott testified that he or his father spoke with the company about getting the AMS back up and running, and the company said there was an outstanding fee owed by Bright & Williamson (which the Court understands to mean Nashville) that ran into the thousands of dollars.  He further testified that the AMS was not working approximately one week prior to April 28, 2006.

[18]    In the Gredy Affidavit, Gredy stated that the AMS was terminated for nonpayment in April 2006.

19

          i.      Scott testified that the Toner Cartridge purchased on or about April 4, 2006 was missing from the CBC Office after Debtor left the Business. He did not authorize Debtor to remove it.

          ii.     Debtor testified that he replaced a used toner cartridge in the printer at the CBC Office with the Toner Cartridge before leaving the Business.

          iii.    The Court finds that neither party is more credible with respect to the Toner Cartridge.

          c.     Debtor wrote check number 1245 dated February 17, 2006 in the amount of $1,000 (the "Loan Check") on the Account, which was made payable to himself. The check register notation indicates that this was a loan to be repaid by February 24, 2006. The parties disagree as to whether this was an appropriate use of funds from the Account.

          i.      Scott testified that the Loan Check was written without his authorization.

          ii.     Debtor testified that he did not make the notation in the check register that the Loan Check was for a loan and that he did not pay it back. Rather, he testified that the Loan Check represented one of the draws he took from the Business.

          iii.    The Court does not find Debtor's testimony credible and relies on the check register to find that Debtor wrote himself the Loan Check without the authorization to do so, and that Debtor did not pay back the loan.

          d.     Debtor wrote two checks on the Account payable to IDOI (Indiana Department of Insurance) for the renewal fee (check number 1249 dated February 22, 2006 in the amount of $40 (the "License Renewal Check")) plus penalty (check number 1248 dated February 22, 2006 in the amount of $120 (the "License Penalty Check")) necessary for his

insurance license to be reinstated. The parties disagree as to whether this was an appropriate use of funds from the Account.

         i.      Scott testified that every agent was responsible to make sure his/her own license was in force and that he/she had the necessary CE credits. Scott considered these personal expenses, and CBC did not pay for personal expenses.[19] Scott did not authorize Debtor to make these payments from the Account.

         ii.      Debtor testified that professional licensing fees were paid by every agency for which he had ever worked, and that the Business paid for the licensing fees for its customer service representatives. Debtor believes this is an appropriate expenditure of CBC funds. Debtor also testified that he missed the renewal deadline by "sheer stupidity."

         iii.      The Court relies on Scott's Deposition testimony, which is supported by the fact that the Judgment Debt does not include damages for the $40 renewal fee, to find that Debtor properly paid the $40 renewal fee from the Account, but Debtor was not authorized to pay the $120 penalty fee from the Account.

      23.      Debtor took premium checks made payable to "Bright & Williamson" from clients and deposited them into his FNB Account, including Yan An Inc. (check number 1810 dated April 7, 2006 in the amount of $1,100), China Buffet (check number 1199 dated March 28, 2006 in the amount of $1,200), Shao Wen Chen (check number 1326 dated March 29, 2006 in the amount of $1,308.18), and Michael E. Stone (check number 4599 dated April 7, 2006 in the amount of $1,284.33) (collectively, the "Converted Checks").

---

[19]      In the Deposition, Scott testified that he agreed to pay for a regular licensing fee, but not for the penalty. When questioned further about improper payments made to Debtor via checks written on the Account, Scott testified that the payments in the check registry appeared to be properly payable except for the Loan Check and the License Penalty Check. In addition, copies of two checks written on the Account and signed by Scott apparently paying for continuing education were admitted into evidence at the trial. It is unclear from looking at those checks on whose behalf they were written. When cross-examined at the trial, Scott testified that CBC may have paid his expenses because he owns the company.

a.      Scott testified that coverage was not bound for Yan An Inc., and that Debtor issued a "phony" certificate of insurance leading Yan An Inc. to believe it had coverage.

b.      Debtor testified that Yan An Inc. was covered, along with restaurants owned by family members of Yan An Inc.'s owner(s).

c.      The Court need not resolve this issue because beyond the deposit of the Yan An Inc. check into the FNB Account (which Debtor admitted at trial), there is no evidence that CBC suffered any damages as a result of this purported lack of coverage or phony certificate of insurance.

d.      Coverage may or may not have been bound for the other clients whose Converted Checks were deposited by Debtor into the FNB Account.  However, there is no evidence that CBC suffered any damages as a result of any possible lack of coverage.

e.      The Court finds that the Converted Checks were property of CBC because (i) they were made payable to Bright & Williamson, CBC's d/b/a at that time; and (ii) they were dated prior to CBC and Debtor parting ways.  The Court further finds that CBC did not authorize Debtor to deposit the Converted Checks into his personal FNB Account.

24.     Debtor took premium checks made payable to "Bright & Williamson" from clients and deposited them into his FNB Account, including Jay C. Hall and Deborah D. Hall (check number 894 dated May 3, 2006 in the amount of $1,482.50), Settys Real Estate (check number 5084 dated May 12, 2006 in the amount of $1,313), and Paintbox Homes LLC (check number 1709 dated May 24, 2006 in the amount of $1,051.74) (collectively, the "Post-Split Checks").  The Post-Split Checks were dated after the Business stopped operating.

a.      Coverage was not bound for Settys Real Estate.  Coverage may or may not have been bound for the other clients whose Post-Split Checks were deposited by Debtor into the

FNB Account.  However, there is no evidence that CBC suffered any damages as a result of any possible lack of coverage.

b.    The Court finds that the CBC has not proven that the Post-Split Checks were property of CBC:  (i) the Post-Split Checks were dated after CBC and Debtor parted ways; (ii) CBC did not show that the checks were delivered to or intended to be delivered to CBC; (iii) CBC did not show that the corresponding policies were bound through CBC's contracts with the respective insurers and thus was due the premium;[20] and (iv) naming Bright & Williamson as payee is not dispositive because Debtor also used that name after April 28, 2006, at least before Gredy withdrew his authority for Debtor's use of that name (see ¶ 27 below).

25.    Certain premium checks made payable to "Bright & Williamson" were deposited into the Account, including Braco, LLC (check number 1691 dated February 2, 2006 in the amount of $200); First American Title Insurance Company (check number 4503897 dated February 2, 2006 in the amount of $1,484 f/b/o Mr. Seibert); First American Title Insurance Company (check number 4503902 dated February 2, 2006 in the amount of $93 f/b/o Mr. Seibert); First American Title Insurance Company (check number 4503909 dated February 3, 2006 in the amount of $1,389 f/b/o Mr. Hamrah); First American Title Insurance Company (check number 4504067 dated February 15, 2006 in the amount of $1,711 f/b/o Mr. Hamrah); and First American Title Insurance Company (check number 4504078 dated February 15, 2006 in the amount of $2,115 f/b/o Mr. Hamrah).  Coverage was not bound for these clients.

a.    Braco, LLC had property damaged by wind on or about February 2, 2006. Even though Braco, LLC had paid the premium for the relevant insurance coverage, coverage

---

[20]    There is a standard flood insurance application for David Bond (a principal of Paintbox Homes) dated June 19, 2006 that reflects CBC's agent number and the CBC Office address (Plaintiff's Exhibit HH).  However, the certificate of property insurance dated June 19, 2006, whose policy number matches the quote number on the application, shows the Buck Office address (Plaintiff's Exhibit II).

was not available because it was not bound.  CBC secured a release from Braco, LLC with
respect to such unbound coverage/claim made in exchange for a payment of $1,200.

       b.    Clients had property damaged by a hail storm on or about April 7, 2006.
Even though the clients had paid the premiums for the relevant insurance coverages, coverage
was not available because it was not bound.  CBC secured releases and/or covenants not to sue
with respect to such unbound coverage/claims made as follows:  William Beck ($4,570);[21]
Robert Siebert ($3,191); Hamid Hamrah ($5,494); and Mohammad Hamrah ($3,038).  Under
CBC's errors and omissions policy, CBC was to pay a $5000 deductible per occurrence, with a
three occurrence maximum.  The relationship between these payments and the deductible(s) is
unclear from the testimony at trial.[22]

       c.    Based on the evidence, and in particular the lack of a CBC policy on who
was responsible for binding coverage, the Court cannot find that Debtor was responsible for
failure to bind the coverage that led to the losses suffered based on the failure to bind coverage
for Braco, LLC, William Beck, Robert Siebert, Hamid Hamrah and Mohammad Hamrah.

       26.    After parting ways with CBC and Scott, Debtor operated first as a sole proprietor
using the "Bright & Williamson Insurance" name, and then set up Bright & Williamson
Insurance Services II, Inc. d/b/a Buck Insurance Services ("Buck").  Buck's office was located at
6319 East US 36, Avon, Indiana (the "Buck Office").  Debtor was the sole shareholder of Buck.
Buck was licensed by the Indiana Department of Insurance on May 19, 2006.

---

[21]    William Beck's loss is not included in the Judgment Debt.

[22]    The Judgment Debt includes $15,000 for errors and omissions liability:  $5,000 for the deductible CBC
paid and $10,000 because CBC remains liable to pay that amount towards the deductible.  Westport Insurance
Company, CBC's errors and omissions liability carrier, paid some portion of the settlement payments.

27.     Gredy's attorney sent Debtor a letter telling him that he could not use the "Bright & Williamson" name after he parted ways with CBC and Scott.  It is unclear when that letter was sent.

28.     Hayes left CBC and worked in the Buck Office helping Debtor while she was looking for another job.  Hayes did not receive a paycheck; she was not an agent and was not contractually obligated to perform any particular duties, but she would do something if she saw that it needed to be done.  While she did not have authority to bind coverage, she would send things to be bound.  She does not believe she worked on any of Scott's client files, though the evidence included copies of a few letters that Hayes sent transmitting declarations pages with the CBC Office address on them.[23]

29.     Buck used CBC's agency number, address, premium financing agreements and/or relationships with insurers after the Business stopped operating.  The parties disagree on this point.

     a.     Scott testified that Debtor used CBC's agency number, address, premium financing agreements and/or relationships with insurers without his authorization and exposed CBC to liability by doing so.

     b.     Debtor testified that there was "confusion" immediately after Debtor and CBC/Scott parted ways, and that some things like addresses got crisscrossed in the beginning.

     c.     Some documentary evidence exists to support Scott's version, particularly documents that have Debtor's signature on them after the Business stopped operating.  However, it is difficult at best, impossible at worst, to tell whether the insurance companies issued

---

[23]     This testimony may have been further contradicted by Plaintiff's Exhibit LLLL, in which Hayes references a "John" policy in communication with Zurich.  Hayes was not questioned about this during her testimony, but Scott testified that the reference means "my agency's policy."

declarations pages that show CBC's agency number or address, for example, as a result of their own mistake or confusion or if they were induced to do so by Debtor.

        d.     Furthermore, the Court cannot tie any damages specifically to this conduct through testimony or documentary evidence and therefore cannot find that CBC suffered damages therefrom even if Scott's version is true.

        30.     Debtor sent out information regarding Debtor's move to the Buck Office. The parties disagree on this point.

        a.     Scott testified that Debtor sent a fax to all of Scott's clients acting like Debtor was "Bright & Williamson" and that the Bright & Williamson office (CBC Office) had moved.[24] Scott did not authorize the sending of this fax.

        b.     Debtor testified that the fax only informed Debtor's clients, including some that he had serviced when the Business was operating at the CBC Office, that Debtor had moved.

        c.     Only one such fax was offered into evidence, which was sent to Debbie Mulder. In addition, a letter to Misty Mulder was admitted into evidence that referenced the "new address and phone."[25]

        d.     There was no testimony or documentary evidence that these faxes led any client to leave CBC and go with Buck. Moreover, the Court cannot tie any damages specifically to this conduct and therefore cannot find that CBC suffered damages therefrom even if Scott's version is true.

---

[24]     See Plaintiff's Exhibit LLL.

[25]     See Plaintiff's Exhibit MMM.

31.     With respect to the damages awarded by the State Court, the Judgment Debt

consists of:

a.      $45,893.22 on CBC's claim under the Crime Victims Relief Act, Ind.

Code § 34-24-3-1 ("CVRA") (for conversion under Ind. Code § 35-43-4-3):

- $3,300 (including treble damages) for knowingly converting a $1,100 Yan An Inc. check delivered to Debtor in order to enable CBC to obtain a commercial liability policy for Yan An Inc. (see ¶ 23 above).
- $3,000 (including treble damages) for knowingly drawing a $1,000 check payable to himself on the Account without CBC's authorization (see ¶ 22(c) above).
- $360 (including treble damages) for knowingly drawing a $120 check payable to the Indiana Department of Insurance on the Account without CBC's authorization (see ¶ 22(d) above).
- $3,600 treble damages for knowingly converting a $1,200 China Buffet check delivered to Debtor in order to enable CBC to obtain certain insurance policies for China Buffet (see ¶ 23 above).
- $3,924.54 (including treble damages) for knowingly converting a $1,308.18 Xin Feng (Shao Wen Chen) check delivered to Debtor in order to enable CBC to obtain certain insurance policies for Xin Feng (see ¶ 23 above).
- $3,852.99 (including treble damages) for knowingly converting a $1,284.33 Michael Stone check delivered to Debtor in order to enable CBC to obtain certain insurance policies (see ¶ 23 above).
- $4,447.50 (including treble damages) for knowingly converting a $1,482.50 Jay and Deborah Hall check delivered to Debtor in order to enable CBC to obtain certain insurance policies for the Halls (see ¶ 24 above).
- $3,939 (including treble damages) for knowingly converting a $1,313 Settys Real Estate check delivered to Debtor in order to enable CBC to obtain certain insurance policies for Settys Real Estate and placing it into the FNB Account (see ¶ 24 above).
- $3,155.22 (including treble damages) for knowingly converting a $1,051.74 Paintbox Homes, LLC check delivered to Debtor in order to enable CBC to obtain certain insurance policies for Paintbox Homes, LLC (see ¶ 24 above).
- $15,990 (including treble damages) for knowingly converting a $5,330 Life Mate, Inc. check (the "Life Mate Check") delivered to

Debtor in order to enable CBC to obtain certain insurance policies for Life Mate, Inc.[26]

- $293.97 (including treble damages) for converting a $97.99 toner cartridge from CBC (see ¶ 22(b) above).

b.    $365,432.60 on CBC's claim for breach of fiduciary duty:

- $1,100 for depositing a Yan An Inc. check that was intended for CBC into the FNB Account.
- $1,000 for drawing a check payable to himself on the Account without authorization.
- $120 Debtor took from the Account to pay for personal insurance and licensing fees without authorization.
- $1,200 for depositing a China Buffet check that was intended for CBC into the FNB Account.
- $1,308.18 for depositing a Xin Feng check that was intended for CBC into the FNB Account.
- $1,284.33 for depositing a Michael Stone check that was intended for CBC into the FNB Account.
- $1,482.50 for depositing a Jay and Deborah Hall check that was intended for CBC into the FNB Account.
- $1,313 for depositing a Settys Real Estate check that was intended for CBC into the FNB Account.
- $1,051.74 for depositing a Paintbox Homes, LLC check that was intended for CBC into the FNB Account.
- $5,330 for depositing a Life Mate, Inc. check that was intended for CBC into the FNB Account.
- $97.99 for converting a toner cartridge from CBC.

The amounts stated thus far were awarded under the CVRA claims and thus were not counted as damages pursuant to CBC's breach of fiduciary duty claims to prevent a double recovery.

- $1,200 for subjecting CBC to errors and omissions liability as a result of Debtor's failure to bind Braco, LLC's builder's risk policy (see ¶ 25(a) above).
- $15,000 for subjecting CBC to errors and omissions liability as a result of Debtor's failure to bind insurance policies for Hamid

---

[26] This item of damages is not supported by the record in this adversary proceeding. It appears from the exhibits admitted into evidence at the trial that Life Mate, Inc. financed a portion of its $5,330 premium on May 3, 2006 according to documents signed by Jay C. Hall (Plaintiff's Exhibit MM). The down payment (portion not financed) was $1,482.50, which appears to be the subject of the Jay C. and Deborah D. Hall check in the same amount written on the same date that is referenced in ¶ 24 above. There is no evidence that a check for the balance due was received by Debtor from Life Mate, Inc., the Halls, or the financing company on behalf of Life Mate, Inc., or that any such check was deposited into the FNB Account.

28

Hamrah, Mohammad Hamrah, and Robert Siebert (see ¶ 25(b) and footnotes 21 and 22 above).

- $305 for phone repairs and $2,918 for computer repairs for Debtor's sabotage of CBC's phone and computer system prior to leaving the CBC Office.
- The fair market value of CBC's book of business [calculated by multiplying the annual commission for lost clients by two, with the exceptions of (a) Pools of Fun which was multiplied by five; and (b) Horning Roofing which was multiplied by one] for unlawfully removing certain client files from the CBC Office, soliciting CBC's clients, interfering with CBC's relationship with insurers, and interfering with the relationship between CBC and its clients:
  - o    Pekin Insurance, $2,701.40
  - o    Standard Mutual Insurance, $1,595.40
  - o    Acuity Insurance, $4,825.92
  - o    Grange Insurance, $4,628.60
  - o    First Comp Insurance, $832.40
  - o    Guarantee Insurance, $1,316
  - o    Burns & Wilcox, $7,069.80
  - o    Full O Pep, $31,500
  - o    Full O Pep Bond, $23.60
  - o    Pools of Fun Property/Casualty (Acuity policies), $97,432.05
  - o    Pools of Fun Dental, $19,020
  - o    Pools of Fun Health, $66,930
  - o    Zurich Insurance, $8,970.40
  - o    Horning Roofing, $21,823
- $14,941 for hiring a customer service representative to remedy the problems created by Debtor's breach of fiduciary duty.
- $62,400 for Scott's time spent to piece together CBC's business after Debtor had sabotaged it and to determine the extent of damages caused by Debtor.

c.    $0 on CBC's claims for tortious interference with CBC's contract with Nashville and CBC's contract with its insureds and insurers, and for bad faith, because the damages are the same and CBC is not entitled to a double recovery.

d.    $97,903.36, joint and severally with Buck, for attorney fees and costs:

- $23,730.30 for attorney fees and expenses associated with the original sanction imposed by the State Court and orders of the State Court requiring Debtor to pay attorney fees.
- $74,173.30 for attorney fees on CBC's claims under the CVRA and its claim for bad faith.

**Conclusions of Law**

1.      Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

2.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

3.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4.      Venue is proper in this matter pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      Exceptions to discharge under § 523 "are to be [construed] strictly against a creditor and liberally in favor of the debtor." *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)). "The burden is on the objecting creditor to prove exceptions to discharge." *Id.* (citation omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

**§ 523(a)(4)**

6.      A debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" may be excepted from discharge pursuant to § 523(a)(4).

*Embezzlement*

7.      Embezzlement is:

the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538-39 (7th Cir. 1989), *abrogated on other grounds by Grogan v. Garner*, 489 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In order to prove embezzlement, a creditor must show that the debtor (1) appropriated property for her own benefit; and (2) that she did so with fraudulent intent or deceit. *Id.* Thus, it is not sufficient that the debtor act without authority, but she must also have fraudulent intent.

*Wallner v. Liebl (In re Liebl)*, 434 B.R. 529, 537 (Bankr. N.D. Ill. 2010).

8.      "For embezzlement, fraudulent intent 'is knowledge that the use is devoid of authorization, *scienter* for short.' " *FNA Group, Inc. v. Demetrios Arvanitis (In re Arvanitis)*, 523 B.R. 633, 639 (Bankr. N.D Ill. 2015) (quoting *Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010)). *See also Bank Calumet v. Whiters (In re Whiters)*, 337 B.R. 326, 332 (Bankr. N.D. Ind. 2006) (" 'Embezzlement, for purposes of … § 523 … "requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud." ' " (quotation omitted)).

9.      "Embezzlement differs from larceny only in that the original taking was lawful." *Schaffer v. Dempster (In re Dempster)*, 182 B.R. 790, 802 (Bankr. N.D. Ill. 1995).

*Larceny*

10.      "Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991) (citations omitted). "The original taking must be unlawful and the debtor must have felonious intent at the time of the taking." *Chiromo v. Grigoletti (In re Grigoletti)*, 2010 WL 5055927, at *2 (Bankr. S.D. Ind. 2010) (citation omitted).

*Fraud or Defalcation While Acting in a Fiduciary Capacity*

11.      To prevail on a fraud/defalcation claim under § 523(a)(4), CBC must show: "(1) that the debtor acted as a fiduciary to the creditor at the time the debt was created, and (2) that the debt was caused by fraud or defalcation." *Follett Higher Educ. Group, Inc. v. Berman (In re Berman)*, 629 F.3d 761, 765-66 (7th Cir. 2011).

     a.      With respect to the first element,

The determination of fiduciary capacity for purposes of the bankruptcy code is a question of federal law. *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000). The scope of a fiduciary relationship under section 523(a)(4) is not as broad as the traditional state law concept, and not everyone that state law defines as a fiduciary

is necessarily held to act in a "fiduciary capacity" for section 523(a)(4) purposes. *In re Berman,* 629 F.3d at 767. …

Traditionally, a section 523(a)(4) fiduciary relationship includes any relationship that involves the same high standard as a trust, such as "a lawyer-client relation, a director-shareholder relation, or a managing partner-limited partner relation" because all these relationships call for the principal to "repose a special confidence in the fiduciary." *In re Frain*, 230 F.3d at 1017 (citations omitted). More recently, courts have held that a fiduciary relationship exists for purposes of nondischargeability if "there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge" and this "gives the former a position of ascendancy over the latter" because of the special confidence the principal reposes in the fiduciary. *In re Frain, 230 F.3d at 1017*; *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996). Fiduciary obligations between equals, such as general partners in a partnership or joint venturers, generally do not qualify. *In re Woldman*, 92 F.3d at 547.

*Gibson*, 521 B.R. at 656-57.

A fiduciary relation only qualifies under § 523(a)(4) if it "imposes real duties in advance of the breach." *See Marchiando*, [13 F.3d 1111, 1116 (7th Cir. 1994)]. In *Marchiando*, we recognized the well-established principle that, for purposes of § 523(a)(4), the fiduciary's obligation must exist prior to the alleged wrong. A constructive trust, for example, will not qualify for purposes of § 523(a)(4), since the obligations do not exist until the wrong is committed. *See Marchiando*, 13 F.3d at 1115 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Bennett*, 989 F.2d 779, 784 (5th Cir. 1993); *In re Teichman*, 774 F.2d 1395 (9th Cir. 1985)).

*In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000).

      b.    With respect to the second element,

 "Fraud" generally is interpreted as involving "intentional deceit." 4 Collier 523.10[1][a] at 523–71. Defalcation may refer to nonfraudulent breaches of fiduciary duty. *Bullock v. BankChampaign, N.A.,* [— U.S. —, 133 S.Ct. 1754, 1760, 185 L.Ed.2d 922 (2013)]. The Supreme Court states the term covers

> [R]eckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.... That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of

32

conduct that a law-abiding person would observe in the actor's situation."

*Id.* at 1759-60 (quoting the Model Penal Code).

*Gibson*, 521 B.R. at 657.

## § 523(a)(6)

12.    A debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" may be excepted from discharge pursuant to § 523(a)(6). "Bankruptcy courts in [the Seventh Circuit] have focused on three points:  (1) an injury caused by the debtor (2) willfully and (3) maliciously."  *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (citations omitted).

13.    Injury "is understood to mean a 'violation of another's legal right, for which the law provides a remedy.'  The injury need not have been suffered directly by the creditor asserting the claim.  The creditor's claim must, however, derive from the other's injury."  *Id.* (internal citations omitted).

14.    "Willfulness requires 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.' "  *Id.* (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original)).  " 'Willfulness' can be found either if the 'debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury.' "  *Id.* (quotation omitted).

15.    Maliciousness requires the debtor to act "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm."  *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quotation omitted).  The Seventh Circuit recently reaffirmed its definition of maliciousness from *Thirtyacre* as good law.  *Horsfall*, 738 F.3d at 774-75.

**Tying the Judgment Debt to the Asserted Theories of Nondischargeability**

16.    Tying the components of the Judgment Debt rendered in the State Court Case on the basis of state law to the asserted theories of nondischargeability set forth in federal bankruptcy law is a difficult task.  In CBC's Proposed Findings/Conclusions, it asserted that all damages awarded by the State Court under the CVRA, as well as the damages for phone and computer repairs awarded on the basis of breach of fiduciary duty, are nondischargeable under both §§ 523(a)(4) and (a)(6).  CBC asserted that the remaining damages awarded on the basis of breach of fiduciary duty, such as for failure to bind insurance coverage, compensation for the loss of CBC's book of business, and salary reimbursements, are nondischargeable under § 523(a)(4) only.  The Court has used such assertions to organize its analysis of the nondischargeability of the individual components of the Judgment Debt.

17.    Before specifically addressing each component of the Judgment Debt, the Court notes that fraudulent intent, as is required under both §§ 523(a)(4) and (a)(6), is difficult to prove.  This adversary proceeding arose out of the dissolution of the Business.  Scott and Debtor presented two inconsistent accounts, neither of which was fully credible:  (a) Debtor claims that he left because he had not been paid more than $3,600 during the approximately two years he worked in the Business, and that he took only his clients' files after Debtor and Scott amicably divided up the files one afternoon; versus (b) CBC claims that Debtor effected a highly coordinated effort to shut down the agency through unauthorized removal of all of CBC's client files, sabotage, and tortious interference.  The credibility of CBC's claims are weakened by the Court's inability to reconcile contradictory evidence on material facts, the lack of a non-compete agreement between CBC and Debtor, and the absence of written policies/agreements regarding ownership of accounts, the responsibility for binding coverage and the consequences for the

34

failure to do so.  But it is CBC that has the burden to prove Debtor's fraudulent intent.  In the end, the Court concludes that there are a few instances where CBC satisfied its burden to prove Debtor's fraudulent intent through Debtor's conduct.  When evaluating the totality of the circumstances, the Court cannot conclude that CBC proved by a preponderance of the evidence that Debtor was acting with fraudulent intent, willfully or maliciously toward CBC while he was setting up his own agency.

*Converted Checks*

18.     The Court concludes that Debtor embezzled the Converted Checks.  Debtor came into possession of them lawfully – they were premium payments tendered by the clients to their insurance agent in order to procure insurance coverage.  However, Debtor deposited them into his personal FNB Account, rather than CBC's Account, without CBC's authorization at a time when the Business was operating.  There was no evidence that Debtor made such deposits by mistake or accident or that Debtor forwarded equivalent funds to CBC.  Thus, the dollar amounts of the Converted Checks is excepted from discharge pursuant to § 523(a)(4).

19.     With respect to the Converted Checks, the State Court also awarded treble damages pursuant to the CVRA.  The Court concludes that the associated treble damages are likewise excepted from discharge pursuant to § 523(a)(4) as liability arising from the embezzlement based on the Supreme Court's holding in *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).[27]

---

[27]     *Cohen* was decided under § 523(a)(2)(A).  However, based on the Supreme Court's reasoning, the Court concludes that treble damages and attorney fees are also nondischargeable under § 523(a)(4).  *Cohen*, 523 U.S. at 220, 118 S.Ct. at 1217 ("Because each use of 'debt for' in § 523(a) serves the identical function of introducing a category of nondischargeable debt, the presumption that equivalent words have equivalent meaning when repeated in the same statute … has particular resonance here.") (internal citation omitted).  *See also Parker v. Padgett (In re Padgett)*, 235 B.R. 660, 664 (Bankr. M.D. Fla. 1999); *Falk Eng'g & Surveying, Inc. v. Luedtke (In re Luedtke)*, 429 B.R. 241, 252 n.26 (Bankr. N.D. Ind. 2010).

35

*Post-Split Checks*

20.    The Court concludes that CBC is not entitled to a nondischargeability determination with respect to the Post-Split Checks. Debtor did not commit larceny with respect to the Post-Split Checks because, as with the Converted Checks, Debtor came into possession of the Post-Split Checks lawfully. In addition, CBC cannot recover the value of the Post-Split Checks or the treble damages associated therewith on the theories of embezzlement, fraud or defalcation while acting in a fiduciary capacity, or willful or malicious injury because CBC did not prove by a preponderance of the evidence that the Post-Split Checks were the property of CBC or that CBC was otherwise entitled to the premiums being paid thereby.

21.    Therefore, the Court concludes that the dollar amounts of the Post-Split Checks and associated treble damages are not excepted from discharge pursuant to §§ 523(a)(4) or (a)(6).

*Loan Check*

22.    The Court concludes that Debtor committed larceny with respect to the Loan Check. Debtor was not authorized to write the Loan Check and he did not pay back the funds. Thus, the dollar amount of the Loan Check is excepted from discharge pursuant to § 523(a)(4).

23.    With respect to the Loan Check, the State Court also awarded treble damages pursuant to the CVRA. The Court concludes that the associated treble damages are likewise excepted from discharge pursuant to § 523(a)(4) as liability arising from larceny based on *Cohen*.

*License Renewal Check and License Penalty Check*

24.    The Court concludes that CBC is not entitled to a nondischargeability determination with respect to the License Renewal Check because the Court found that Debtor

36

properly paid the renewal fee for his license from the Account.

25.     Therefore, the Court concludes that the dollar amounts of the License Renewal Check and associated treble damages are not excepted from discharge pursuant to §§ 523(a)(4) or (a)(6).

26.     The Court concludes that Debtor committed larceny with respect to the License Penalty Check.  Debtor was not authorized to write the License Penalty Check, and he used CBC's funds to pay to correct his personal mistake of not renewing his license in a timely fashion.  Thus, the dollar amount of the License Penalty Check is excepted from discharge pursuant to § 523(a)(4).

27.     With respect to the License Penalty Check, the State Court also awarded treble damages pursuant to the CVRA.  The Court concludes that the associated treble damages are likewise excepted from discharge pursuant to § 523(a)(4) as liability arising from larceny based on *Cohen*.

*Life Mate Check*

28.     The Court concludes that CBC is not entitled to a nondischargeability determination with respect to the Life Mate Check because there is no evidence that a $5,330 check from Life Mate, Inc. (a) was received; (b) if it was received, that it was deposited into the FNB Account; or (c) that CBC was the rightful owner of any such check.[28]

29.     Therefore, the Court concludes that the dollar amounts of the Life Mate Check and associated treble damages are not excepted from discharge pursuant to §§ 523(a)(4) or (a)(6).

---

[28]     See footnote 26 above.

37

*Toner Cartridge*

30.     The Court concludes that CBC is not entitled to a nondischargeability determination with respect to the Toner Cartridge.  The evidence included an invoice for CBC's purchase of the Toner Cartridge, but the Court is not satisfied that Debtor removed the Toner Cartridge from the CBC Office based on the evidence presented.

31.     Therefore, the Court concludes that the dollar amounts of the Toner Cartridge and associated treble damages are not excepted from discharge pursuant to §§ 523(a)(4) or (a)(6).

*Failure to Bind Coverage*

32.     The Court concludes that CBC is not entitled to a nondischargeability determination with respect to the components of the Judgment Debt awarded because insurance coverage was not bound.  The sums paid in those circumstances by CBC or its errors and omissions insurer were not CBC funds that were taken or appropriated by Debtor.  Thus, embezzlement and larceny are not grounds for nondischargeability.  While it is uncontested that Debtor was acting in a fiduciary capacity for CBC while working in the Business, CBC has not shown that Debtor committed fraud or defalcation.  CBC had no policy with respect to who in the CBC Office had the responsibility to bind coverage.  The testimony on that point was contradictory such that the Court could not find that Debtor was responsible to bind coverage for Braco, LLC, William Beck, Robert Siebert, Hamid Hamrah and Mohammad Hamrah but failed to do so.  Moreover, CBC did not have a policy making the person responsible to bind coverage personally liable in the event coverage was not bound.

33.     Therefore, the Court concludes that the dollar amount of the errors and omissions liability for failure to bind coverage is not excepted from discharge pursuant to § 523(a)(4).

38

*Loss of CBC's Book of Business*

34.     The Court concludes that CBC is not entitled to a nondischargeability determination with respect to the loss of its book of business with a variety of insurance carriers and particular clients.  The factual basis of this portion of CBC's claim rests on Debtor's alleged removal of all client files and Debtor's interference with CBC's relationships with insurance companies and clients, but the evidence does not support these allegations.  For example, CBC did not prove by a preponderance of the evidence that (a) Debtor removed all the clients files from the CBC Office without authorization; (b) CBC was entitled to ownership of all accounts sold or serviced through the CBC Office or that any account of which CBC was the owner was lost because of Debtor's communications or actions;[29] (c) Debtor caused or induced Gredy to terminate the Partnership Agreement, after which CBC could no longer write policies through Nashville's Companies; (d) Debtor was responsible for CBC's losing its ability to write policies through any of the other insurance companies with respect to whom it was awarded damages which are part of the Judgment Debt; or (e) Debtor was responsible for CBC's losing the individual clients with respect to whom it was awarded damages which are part of the Judgment Debt.

35.     Therefore, the Court concludes that the dollar amount of the loss of CBC's book of business is not excepted from discharge pursuant to § 523(a)(4).

*Salary Reimbursements*

36.     The Court concludes that CBC is not entitled to a nondischargeability determination with respect to salary reimbursements of Scott and a customer service representative.  CBC seeks reimbursement for a portion of their salaries representing the time

---

[29]     Even if CBC was the "owner" of accounts sold or serviced through the Business at the CBC Office, competition among insurance agencies is not prohibited under certain circumstances.  *See Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876-77 (Ind. Ct. App. 1998).

39

spent to remedy problems caused by Debtor's breach of fiduciary duty and to determine the extent of damages. Due to the failure of proof as described above, the factual basis necessary for a nondischargeability determination has not been established.

37.    Therefore, the Court concludes that the dollar amount of the salary reimbursements is not excepted from discharge pursuant to § 523(a)(4).

*Phone and Computer Repairs*

38.    The Court concludes that CBC is not entitled to a nondischargeability determination with respect to phone and computer repairs that were the alleged result of Debtor's sabotage prior to leaving the CBC Office. CBC failed to prove by a preponderance of the evidence that Debtor engaged in sabotage, and the Court found to the contrary with respect to the AMS – CBC's access to it was cut off for non-payment.

39.    Therefore, the Court concludes that the dollar amount of the phone and computer repairs is not excepted from discharge pursuant to §§ 523(a)(4) or (a)(6).

*Attorney Fees*

40.    As to the $23,730.30 award of attorney fees and costs associated with the original sanction imposed by the State Court and orders of the State Court awarding attorney fees to CBC, the Court does not find that such fees and expenses arose from Debtor's embezzlement or larceny. Rather, they arose with regard to conduct in the State Court Case. Therefore, those attorney fees and expenses are not excepted from discharge pursuant to § 523(a)(4) under *Cohen*.

41.    Based on *Cohen*, the Court concludes that a portion of the $74,173.30 award of attorney fees and costs associated with CBC's claims under the CVRA is excepted from discharge pursuant to § 523(a)(4) as liability arising from Debtor's embezzlement and/or larceny. The Court has allocated the award proportionately between the claims that were found to be

excepted from discharge (39%) and those found not to be excepted from discharge (61%).  The portion of the attorney fees that is excepted from discharge pursuant to § 523(a)(4) is $28,927.58.

### Decision

Based on the foregoing, the Court hereby concludes that CBC is entitled to a judgment that the following sums are excepted from discharge pursuant to § 523(a)(4):

$14,677.53 for the embezzlement of the Converted Checks, including treble damages.

$3,360 for the larceny of the Loan Check and License Penalty Check, including treble damages

$28,927.59 for attorney fees and costs arising out of Debtor's embezzlement or larceny.

All other components of the Judgment Debt are not excepted from discharge.

The Court will enter judgment consistent with these findings of fact and conclusions of law contemporaneously herewith.

# # #